UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| TERRA CHAMBERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:20-cv-01617-SEP |
| | ) |
| GUPREET S. PADDA, et al., | ) |
| | ) |
| Defendants. | ) |

### MEMORANDUM & ORDER

Before the Court are three motions to dismiss: one filed jointly by Defendants Interventional Center for Pain Management, PC, and Gupreet Padda, Doc. [23]; one filed by Defendant Lab Test, LLC, Doc. [57]; and one filed by Defendant Cyber Diagnostic Medicine, LLC, Doc. [61]. The motions have been fully briefed. For the reasons set forth below, the motion filed by Interventional Center for Pain Management, PC, and Gupreet Padda is denied, and the other two motions are granted.

### BACKGROUND[1]

Plaintiff Terra Chambers asserts claims for violations of the Missouri Human Rights Act (MHRA) against Defendant Interventional Center for Pain Management, PC (CIPM);[2] violations of Title VII against Defendants CIPM, Cyber Diagnostic Medicine (CDM) and Lab Test; and assault and battery against Defendant Gupreet Padda. Doc. [52] at 7-16.

At various times between 2008 and 2010, Plaintiff was an employee of CIPM and worked under the direction of Gupreet Padda, who was a principal in and owner of CIPM in St. Louis, Missouri.[3] *Id.* ¶ 17. During her employment with CIPM, Plaintiff was assigned to work

---

[1] For purposes of this Motion, the Court assumes that the factual allegations in the Complaint are true. *See Neitzke v. Williams,* 490 U.S. 319, 326-27 (1989).

[2] Plaintiff frequently refers to Defendant Interventional Center for Pain Management as "ICPM." *See* Docs. [52], [75]. Defendant claims to do business as "Center for Interventional Pain Management" and refers to itself as CIPM. Doc. [24] at 1. The Court refers to Defendant as CIPM.

[3] CIPM disputes that Plaintiff was employed by CIPM during the relevant period. Doc. [24] at 10. Plaintiff alleges that she was employed by CIPM between 2008 and 2010 and does not claim to have been paid by CIPM after 2010. *See* Doc. [52] ¶¶ 18-21. But Plaintiff alleges that her later arrangements to be paid directly by Lab Test and CDM were "set up by agreement between" Defendants. *Id.* ¶ 21. She

1

in a study that was commissioned and controlled by Padda and CIPM. *Id.* ¶¶ 17, 18. The study, which was "commenced" by the Alfred Mann Foundation (AMF), was active from 2012 to 2017, although AMF was billed for time that Plaintiff spent on the project into 2018. *Id.*

Beginning in 2012, and continuing through her resignation, Plaintiff was also paid as an employee by Lab Test through an arrangement she alleges was set up by Padda and CIPM. *Id.* ¶ 19. Although Plaintiff never worked at any Lab Test facilities, she saw patients of Padda and CIPM and referred them to Lab Test for diagnostic studies. *Id.* Padda and CIPM arranged for Lab Test to pay her compensation as part of the overall compensation it paid to Padda and CIPM, in exchange for their referral of patients to Lab Test. *Id.* From 2017 through 2018, Plaintiff was also paid as an employee by CDM for providing similar services, again under an arrangement set up by Padda and CIPM. *Id.* ¶ 20. As with Lab Test, Padda and CIPM arranged for CDM to pay Plaintiff as part of the compensation CDM provided for referrals that Padda and CIPM made to CDM. *Id.*

Although Plaintiff was paid by Lab Test and CDM from 2012 through her resignation, she still worked at the direction of CIPM and Padda. *Id.* ¶ 22. The arrangements between CIPM and Lab Test and CDM were "factitious"; at all relevant times, CIPM was Plaintiff's actual employer. *Id.* Plaintiff contends that she was only paid by Lab Test and CDM at the direction of, and at the expense of, CIPM and Padda. *Id.* Throughout the time that she was paid by CDM and Lab Test, Plaintiff used facilities and computers provided by CIPM and Padda; she saw CIPM patients; accompanied CIPM patients to medical procedures; assisted CIPM patients in their follow-up appointments; and otherwise assisted Padda and CIPM with CIPM patients who were enrolled in the study. *Id.* ¶¶ 23, 24. CIPM and Padda always maintained control over her employment, including dictating which projects she was assigned to and what her schedule was, which depended on when patients of CIPM were being seen. *Id.* ¶ 24. She also notes that the skills required of her throughout her employment remained the same as when she was first hired by Padda and CIPM in 2008, and that the tasks she performed were always within the scope of CIPM and Padda's regular business, which was seeing patients with chronic pain problems. *Id.*

---

further alleges that the scheme was concocted by Padda so that he would be able to claim that she was not his employee—but rather, an employee of either CDM or Lab Test—so that he could engage in a pattern of sexual discrimination and harassment against her and not be held liable as her employer. *Id.* For the purposes of evaluating Defendants' motions to dismiss, the Court assumes Plaintiff's allegations to be true. *See Neitzke*, 490 U.S. at 326-27.

Plaintiff alleges that, throughout her employment, Padda engaged in sexual misconduct and harassment towards her, which were continual in nature and created a hostile and abusive work environment based on her status as a woman. *Id.* at 25. Specifically, Padda hugged or placed his arm around her, slapped her buttocks, grabbed and squeezed her buttocks and breasts, placed his hand in Plaintiff's scrubs to touch her genitals and buttocks, brushed against her while not wearing underwear under his scrubs to rub his erection against her, and exposed himself to her. *Id.* Such acts continued throughout her employment until she resigned her position in March 2019. *Id.* ¶¶ 25, 33.

Plaintiff also alleges that, beginning in March 2018, Padda forced her to "provide oral sex for him, and on several occasions, sexually penetrated" her. *Id.* ¶ 26. In her April 3, 2019, Charge of Discrimination with the Missouri Commission on Human Rights (MCHR),[4] Plaintiff contends that from "April to May 2018, Mr. Padda sexually assaulted me." Doc. [52-1] at 1. She alleges that the assaults "continued to occur many times until June of 2018, when Mr. Padda was accused by a different employee of sexual assault. He slowed down at that point and would only grope me and say lewd things[.]" *Id.* She also contends that she was "assaulted again in August 2018," and that then Padda "resort[ed] to groping [her] for months" after that. *Id.*

In addition to the sexual misconduct, Plaintiff alleges that Padda threatened her with the loss of her job if she complained or reported him to the authorities. Doc. [52] ¶ 27. Her Charge of Discrimination asserts that, beginning in early 2018, Padda "constantly" spoke to her about "how he could easily end [her] employment." Doc. [52-1] at 1. The conversations occurred "multiple times a day" and made Plaintiff fearful. *Id.* Padda told her that he was "vindictive" and that, if she wanted to keep her job, then she needed to give him what he wanted. *Id.* Plaintiff asserts that Padda knew his conduct was offensive and unwelcome, and that he made no effort to refrain from the misconduct. Doc. [52] ¶¶ 28, 29. Plaintiff claims that she reasonably believed that Padda was in a position to terminate her employment at the CIPM offices, either by terminating her work on the AMF project or by causing CDM and/or Lab Test to stop paying her. *Id.* ¶ 30; *see* Doc. [52-1] at 1.

---

[4] The Court properly considers the Charge of Discrimination, Doc. [52-1], because it is "incorporated by reference" into the pleadings, *Dittmer Props., LP v. FDIC*, 708 F.3d 1011, 1021 (8th Cir. 2013) (quotation marks omitted), and it is a public record, *Faisbich v. Univ. of Minn.*, 304 F.3d 797, 802-03 (8th Cir. 2002) (citation omitted).

3

Plaintiff resigned from her position at the CIPM facilities in March 2019, and left her employment with Lab Test and CDM on May 31, 2019. Doc. [52] ¶ 33. On April 3, 2019, Plaintiff filed a Charge of Discrimination with the MCHR, alleging that Padda sexually harassed her and that she was discriminated against while working for CIPM. *Id.* ¶ 34; Doc. [52-1]. On November 13, 2019, Plaintiff filed a second Charge of Discrimination with the MCHR, alleging that Padda sexually harassed her and that she was discriminated against while working for CDM and Lab Test. Docs. [52] ¶ 35; [52-2]; [52-3].

Plaintiff brought this suit on February 4, 2020, Doc. [52] ¶ 36, but did not receive her Right to Sue Letter until October 7, 2020. Docs. [52] ¶ 36, [52-4]. Plaintiff's First Amended Complaint was timely filed within 90 days of the Right to Sue Letter on November 6, 2020. Docs. [52] ¶ 36; [62] at 3. On February 26, 2021, with leave from the Court, Plaintiff filed her Second Amended Complaint, alleging violations of the MHRA and Title VII against CIPM, Padda, CDM, and Lab Test, as well as assault and battery against Padda. Doc. [52] at 7-16. On May 13, 2021, Plaintiff filed a series of notices of voluntary dismissals, dismissing the MHRA and Title VII claims against Padda, Doc. [79]; the MHRA claim against Lab Test, Doc. [80]; and the MHRA claim against CDM, Doc. [81].

## LEGAL STANDARD

The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is to test the legal sufficiency of a complaint. When considering a Rule 12(b)(6) motion, a court assumes the factual allegations of a complaint are true, *Neitzke*, 490 U.S. at 326-27, and draws all reasonable inferences in the non-movant's favor. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (citation omitted).

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Bell Atlantic Corp. v. Twombly,* the Supreme Court clarified that complaints must contain "more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not do." 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). The issue in considering such a motion is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of the claim. *See Twombly,* 550 U.S. at 556.

4

I.     **Plaintiff successfully states MHRA and Title VII claims against CIPM.**

Defendant CIPM argues that Plaintiff's MHRA and Title VII claims must be dismissed because her MHRA claim is untimely, and because she fails to plead an employment relationship with CIPM during the relevant period. *See* Doc. [24] at 5, 8. The Court disagrees.

**A. Plaintiff's MHRA claim is timely.**

To bring an action under the MHRA, a plaintiff must first exhaust her administrative remedies by filing a Charge of Discrimination with the MCHR within 180 days of the alleged discriminatory act. Mo. Rev. Stat. § 213.075.1; *see Wiedner v. Ferrellgas, Inc.*, 607 S.W.3d 231, 239 (Mo. Ct. App. 2020). Failure to timely file a charge of discrimination is a "complete defense," requiring dismissal of the allegations related to that charge. Mo. Rev. Stat. § 213.075.1; *see Gillespie v. Charter Commc'ns*, 31. F. Supp. 3d 1030, 1033 (E.D. Mo. 2014) (citing *Holland v. Sam's Club*, 487 F.3d 641, 644 (8th Cir. 2007)). "Any act of discrimination occurring outside this 180-day period is considered 'merely an unfortunate event in history which has no present legal consequences.'" *Pollock v. Wetterau Food Distrib. Grp.*, 11 S.W.3d 754, 763 (Mo. Ct. App. 1999) (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 557 (1977)).

The MHRA's 180-day statute of limitations is subject to equitable exceptions, including the continuing violation doctrine. *Gillespie*, 31 F. Supp. 3d at 1033 (citing *Rowe v. Hussmann Corp.*, 381 F.3d 775, 782 (8th Cir. 2004)). A continuing violation is "a series of closely-related, similar events that occurred within the same general time period and stemmed from the same source." *Pollock*, 11 S.W.3d at 763. Some conduct "cannot be said to occur on any particular day," but "occurs over a series of days or perhaps years." *Giandinoto v. Chemir Analytical Servs., Inc.*, 545 F. Supp. 2d 952, 957 (E.D. Mo. 2007) (quoting *Jensen v. Henderson*, 315 F.3d 854, 859 (8th Cir. 2002)). Therefore, recovery is possible for a discriminatory act that occurred outside the limitations period if the plaintiff can demonstrate that "the act is part of an ongoing practice or pattern of discrimination by her employer." *See Muhammad v. City of St. Louis*, 2019 WL 4576885, at *2 (E.D. Mo. Sept. 20, 2019) (quoting *Plengemeier v. Thermadyne Indus., Inc.*, 409 S.W.3d 395, 401 (Mo. Ct. App. 2013)).

To successfully plead a continuing violation, a plaintiff must first "demonstrate that at least one act occurred within the filing period," and then "show that the current claim of discrimination is part of 'a series of interrelated events, rather than isolated or sporadic acts of

5

intentional discrimination.'" *Tisch v. DST Sys., Inc.*, 368 S.W.3d 245, 252 (Mo. Ct. App. 2012) (quoting *Pollock*, 11 S.W.3d at 763). Courts applying the test look for "'day-to-day' discriminatory events that occur on a regular basis, which . . . may not be significant individually but establish a continuing violation due to their cumulative effect." *Id.* (citing *Pollock*, 11 S.W.3d at 763). If a plaintiff satisfies both parts of the test, "the 180-day filing period becomes irrelevant" and she "may then offer evidence of the entire continuing violation." *Muhammad*, 2019 WL 4576885, at *2 (quoting *Tisch*, 368 S.W.3d at 252). Continuing violations are most commonly found when plaintiffs assert hostile work environment claims, which involve repeated conduct and cannot be pinpointed to a precise moment. *Cooper v. KSHB-TV 41*, 2018 WL 8131234, at *4 (W.D. Mo. Apr. 2, 2018) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002)); *see also Tisch*, 368 S.W.3d at 254 (quoting *Morgan*, 536 U.S. at 115).

An isolated event, even one with continuing impact, is not a continuing violation. *Herrero v. St. Louis Univ. Hosp.*, 109 F.3d 481, 486 (8th Cir. 1997) (citation omitted). "Discrete acts," occurring at a particular moment in time, are not actionable if time barred, even when they relate to acts alleged in timely filed charges. *Tisch*, 368 S.W.3d at 253-54 (quoting *Morgan*, 536 U.S. at 110, 113-14); *see Frey v. Fed. Rsrv. Bank of St. Louis*, 2015 WL 4526963, at *3 (E.D. Mo. July 27, 2015). Prior acts may nevertheless be used as background evidence in support of timely claims. *Tisch*, 368 S.W.3d at 254 (citing Morgan, 536 U.S. at 113); *see also Williams v. Lender Processing Servs., Inc.*, 2013 WL 5739059, at *1 (E.D. Mo. Oct. 22, 2013).

Plaintiff filed her Charge of Discrimination with the MCHR as to CIPM on April 3, 2019, Doc. [52-1], and has thus exhausted her administrative remedies for discriminatory acts that occurred after October 5, 2018. CIPM argues that Plaintiff's Charge of Discrimination alleged incidents between "early 2018" and "August 2018," and she did not exhaust her administrative remedies for those acts. Doc. [84] at 1. CIPM admits that Plaintiff's Charge identified one incident—the alleged constructive discharge in March 2019—that occurred within 180 days of the filing but argues that the allegations in Plaintiff's Second Amended Complaint, Doc. [52], do not mention the constructive discharge allegation and "appear to be based on incidents of a separate and distinct nature that she previously alleged occurred in 2018."[5]  Doc. [84] at 2.

---

[5] To the extent that Defendants' filings discuss allegations contained only in the First Amended Complaint, *see* Doc. [24] at 6-7, the Court disregards those arguments. The operative pleading in this case is Plaintiff's Second Amended Complaint, Doc. [52].

6

In response, Plaintiff invokes the continuing violation doctrine, arguing that CIPM's discriminatory actions were "part of a continuing violation and a pattern and practice of offensive conduct that continued throughout her employment until that employment ended in March, 2019[.]" Doc. [52] ¶ 25.

### 1. *Plaintiff sufficiently alleges that the constructive discharge and other misconduct occurred within the filing period.*

Plaintiff need not invoke the continuing violation doctrine for several of her allegations because they fall within the filing period based on the timing alleged in her pleading. In her Second Amended Complaint, Plaintiff alleges that a number of discriminatory acts occurred within the filing period (i.e., after October 5, 2018). Specifically, she alleges that the acts enumerated in paragraph 25, including the instances of groping, sexual touching and genital exposure, "continued throughout her employment until that employment ended in March, 2019." Doc. [52] ¶ 25. That those allegations continued until her resignation is consistent with her Charge of Discrimination, in which Plaintiff alleges that after the August 2018 sexual assault, Padda "resort[ed] to groping [her] for months."[6] Doc. [52-1] at 1. The Court construes Plaintiff's Second Amended Complaint and her Charge of Discrimination liberally, *see Reed v. McDonald's Corp.*, 363 S.W.3d 134, 143 (Mo. Ct. App. 2012), and finds that Plaintiff sufficiently alleges that the discriminatory behavior continued until her resignation, and thus, occurred within the 180-day filing period. *See Plengemeier*, 409 S.W.3d at 401 (plaintiff sufficiently pled discriminatory conduct within the filing period by alleging that it "continued through" the filing period).

Plaintiff also argues that Padda's discriminatory acts resulted in her constructive discharge in March 2019, which also falls within the filing period. Doc. [75] at 3 (citing Doc. [52] ¶ 33). "Constructive discharge occurs when an employer deliberately renders an employee's working conditions so intolerable that the employee is forced to quit his or her job." *Wallingsford v. City of Maplewood*, 287 S.W.3d 682, 686 (Mo. banc. 2009) (citing *Gamber v. Missouri Dept. of Health and Senior Servs.*, 225 S.W.3d 470, 477 (Mo. Ct. App. 2007)). "[T]he

---

[6] CIPM diminishes Plaintiff's Charge of Discrimination, arguing that, in it, she merely states that discriminatory incidents occurred between "early 2018" and "August 2018." Doc. [84] at 1. While Plaintiff's Charge does allege discriminatory incidents in the form of sexual assault and verbal harassment between that period, CIPM ignores the portion that specifically alleges that after August 2018, Padda "would resort to groping [Plaintiff] for months." Doc. [52-1] at 1.

working conditions must be such that a reasonable person would find them intolerable." *Id.* Constructive discharge claims generally "include evidence of subtle discrimination in the form of social coercion, demotions or changes in job responsibilities," and as a result, whether constructive discharge has occurred "is a fact-intensive inquiry." *Id.* (citing *Levendos v. Stern Entm't, Inc.*, 860 F.2d 1227, 1230 (3d Cir 1988)). "A constructive discharge is a discrete act of discrimination or retaliation that stands separate and distinct from the continuing violation of a hostile work environment." *Henson v. Union Pac. R.R. Co.*, 3 F.4th 1075, 1081 (8th Cir. 2021) (citations omitted).

Plaintiff's Charge of Discrimination and Second Amended Complaint sufficiently plead a constructive discharge claim within the filing period. Neither party disputes that Plaintiff left her employment with CIPM in March 2019. And Plaintiff has sufficiently pled that the events leading up to her resignation constitute constructive discharge. As discussed above, Plaintiff has successfully pled that the acts of groping and unwanted sexual advances described in ¶ 25 of her Second Amended Complaint and in her April 3, 2019, Charge occurred within the filing period. Repeated acts of sexual coercion continuing until her resignation certainly could qualify as working conditions that a reasonable employee would find intolerable. *See Wallingsford*, 287 S.W.3d at 686. And Plaintiff alleges that she was forced to resign in March 2019 *because* of Padda's discriminatory behavior. Doc. [52] ¶ 33. Accordingly, she has sufficiently pled that she was constructively discharged during the filing period.

### 2. *Plaintiff's other allegations qualify as continuing violations.*

In addition to the constructive discharge and the allegations related to Padda's groping of Plaintiff, Plaintiff's Second Amended Complaint and Charge of Discrimination assert several other discriminatory acts, including: (1) in early 2018, Padda "constantly" spoke with Plaintiff about how he could end her employment; (2) between April and May 2018, Padda sexually assaulted Plaintiff and those assaults continued to occur "many times until June of 2018"; (3) Padda told Plaintiff that she must "give him what he wanted" or else she would lose her employment; and (4) in August 2018, Padda sexually assaulted Plaintiff again. Docs. [52-1] at 1; [52] ¶ 26.[7] None of those alleged acts occurred after October 5, 2018, however, and therefore—

---

[7] The Second Amended Complaint does not provide temporal specifics for the alleged sexual assaults. It states that, "beginning in March of 2018," Padda forced Plaintiff to "provide oral sex for him, and on several occasions, sexually penetrated" her, but it does not allege when that conduct ended. Doc. [52] ¶ 26. The Court therefore relies on dates contained in the Charge of Discrimination. Doc. [52-1].

8

barring an equitable exception—none falls within the limitations period. Still, Plaintiff argues that they are actionable under the continuing violations doctrine.

Plaintiff meets the first step of establishing a continuing violation: At least one of the alleged acts occurred within the filing period. *Tisch*, 368 S.W.3d at 252. As discussed above, the alleged constructive discharge and the alleged groping and touching fall within the filing period. The second step requires that Plaintiff demonstrate that the acts of discrimination were "part of a series of interrelated events, rather than isolated or sporadic acts of intentional discrimination." *Id.* (quoting *Pollock*, 11 S.W.3d at 763) (quotation marks omitted). The relevant inquiry is whether the acts occurring within the 180-day period and those outside it may "be considered part of the same actionable hostile work environment practice." *Rowe v. Hussmann Corp.*, 381 F.3d 775, 780 (8th Cir. 2004).

First, with respect to the allegations that Padda threatened Plaintiff with the loss of her employment if she did not do what he wanted and that he spoke frequently about terminating her employment, such harassing comments are the type of "day-to-day discriminatory events" that, taken together, "establish a continuing violation due to their cumulative effect." *Tisch*, 368 S.W.3d at 255 (citing *Pollock*, 11 S.W.3d at 763). Plaintiff does not allege that Padda made comments regarding her termination on one or two isolated occasions. Instead, she alleges that the comments were "constant[]" Doc. [52-1] at 1. Moreover, the allegation that after "*these* encounters . . . Plaintiff [was threatened] with the loss of her work . . ." suggests that the comments occurred after each incident of Padda groping or touching Plaintiff. Doc. [52] ¶ 27 (emphasis added). Therefore, construing Plaintiff's pleading liberally, and drawing all reasonable inferences in her favor, Plaintiff has successfully alleged continuing violations with respect to Padda's comments regarding her potential termination.

Second, the alleged sexual assaults also constitute continuing violations. Although the Court has held that a *single* sexual assault is "identified individually as [a] single event," *Kovach v. MFA, Inc.*, 2021 WL 4125045, at * 5 (quoting *Tisch*, 368 S.W.3d at 253), Plaintiff's pleading alleges several sexual assaults connected by periods of other sexual harassment, including groping and other forms of non-consensual sexual touching. Doc. [52-1] ("These assaults continued to occur many times until June of 2018" until Padda "slowed down . . . and would only grope me and say lewd things."); Doc. [52] ¶ 25 (the alleged offensive acts "continued throughout [Plaintiff's] employment until that employment ended in March, 2019").

9

In this case, the same individual—Padda—allegedly committed all of the harassing acts before and after October 5, 2018. *See Rowe*, 381 F.3d at 781. The discriminatory actions alleged both before and after that date are "so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice" giving rise to Plaintiff's claims. *Id.* (citing *Morgan*, 536 U.S. at 107). Although the acts of sexual misconduct may be considered "isolated" in the sense that they, by their nature, occurred at specific moment in time, they also "occur[ed] on a regular basis" and are part of the "interrelated events" which make up Plaintiff's hostile work environment claim. *Tisch*, 368 S.W.3d at 252 (quoting *Pollock*, 11 S.W.3d at 767). Therefore, again construing Plaintiff's pleading liberally and drawing reasonable inferences in her favor, the allegations related to sexual assaults occurring between April and June of 2018, and again in August 2018, constitute continuing violations and may provide a basis for Plaintiff's hostile work environment and constructive discharge claims. *See id.*

### B. Plaintiff's MHRA and Title VII claims against CIPM sufficiently plead an employment relationship.

Defendant CIPM also argues that Plaintiff's MHRA and Title VII claims against it must be dismissed for failure to state a claim because Plaintiff has not sufficiently alleged an employment relationship with it. Doc. [24] at 8. The MHRA and Title VII prohibit *employers* from discriminating against their employees on the basis of sex. Mo. Rev. Stat. § 213.055; 42 U.S.C. § 2000e-2(a). Both the MHRA and Title VII define the term "employer,"[8] but CIPM does not dispute that it is an employer under the statutes; rather, it argues that it was not *Plaintiff's* employer.

According to CIPM, Plaintiff alleges that she was an employee of CIPM only "from 2008 to 2010"—several years before the period in which the alleged discriminatory acts occurred. Doc. [24] at 10; *see* Doc. [52] ¶ 17. And Plaintiff admits that she was paid by Lab Test and CDM during the relevant period. Doc. [52] ¶¶ 19, 20. CIPM urges the Court to engage in a "careful reading" of Plaintiff's Complaint, which would show that, although Plaintiff was using

---

[8] The MHRA defines "employer" as "a person engaged in an industry affecting commerce who has six or more employees for each working day in each of twenty or more calendars weeks in the current or preceding calendar year . . . ." Mo. Rev. Stat. § 213.010(8). Similarly, Title VII states that "the term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . ." 42 U.S.C. § 2000e(b).

10

the CIPM facilities and maintained a relationship with CIPM, no employer/employee relationship existed during the relevant period. Doc. [24] at 10.

Viewing the Second Amended Complaint in the light most favorable to Plaintiff, and construing all reasonable inferences in her favor, she has successfully pled an employment relationship with CIPM during the relevant period. Plaintiff's allegations are more than conclusory statements. *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. She alleges that CIPM billed for her time working on the AMF project into 2018; that her relationships with Lab Test and CDM were arranged and maintained by CIPM; that she continued to see CIPM patients during the times she was paid by Lab Test and CDM; that CIPM maintained "exclusive control over what work and projects" were assigned to her; that CIPM set her work schedule; and that CIPM "could and did assign additional tasks" to her throughout the relevant period. Doc. [52] ¶¶ 18-24. Taking these allegations as true, as the Court must do at this stage, Plaintiff has pled sufficient facts to plausibly establish an employment relationship with CIPM during the period that Padda allegedly discriminated against her. *Iqbal*, 556 U.S. at 678. Accordingly, CIPM's Motion to Dismiss Plaintiff's MHRA and Title VII claims is denied.

**II.        Plaintiff cannot maintain her Title VII claims against CDM and Lab Test.**

Having dismissed her MHRA claims against CDM and Lab Test, Docs. [80], [81], Plaintiff now asserts only Title VII claims against CDM and Lab Test. On careful review of Plaintiff's pleading and memoranda in opposition, the Court discerns two alternative theories of liability as to Defendants CDM and Lab Test: (1) that they are vicariously liable for Padda's discriminatory actions because they set up the arrangement by which Padda was Plaintiff's supervisor, or (2) that Plaintiff was an employee of CDM and Lab Test as well as CIPM, making them all liable for Padda's actions as her supervisor. Docs. [76] at 3-4; [77] at 3-4.

In support of vicarious liability, Plaintiff alleges that Defendants CDM and Lab Test, and their principals, were friends with Padda and were aware of his history of abuse. Doc. [52] ¶¶ 46, 52. CDM and Lab Test counter that Plaintiff has not sufficiently alleged that either Defendant knew or should have known about Padda's discriminatory actions. Docs. [58] at 4-6; [62] at 5-6. Whether CDM and/or Lab Test knew of or should have known of the discrimination is immaterial, however, as both theories of liability fail for the same reason: Only an *employer* can be liable under Title VII. 42 U.S.C. § 2000e-2(a). Defendants contend that the allegations in Plaintiff's Second Amended Complaint do not support a claim that CDM or Lab Test was her

11

employer.  They argue that Plaintiff's allegations are inconsistent in that she alleges that CIPM, CDM, and Lab Test were *all* her employers during the same period, which Defendants argue is illogical.  Doc. [82] at 2.[9]

Construing her pleading liberally, and again drawing all reasonable inferences in her favor, Plaintiff fails to state a claim that CDM and Lab Test were her employers during the relevant period such that they may be held liable under Title VII.  Plaintiff argues that she has sufficiently pled a "joint employer relationship."  Docs. [76] at 5; [77] at 7.  The crux of her argument appears to be that, under the alleged circumstances, all three Defendants had a degree of control over her employment such that they may all be held liable for Padda's harassment.  *See id.*; *see Johnson v. McDonald Corp.*, 542 F. Supp. 3d 888, 891-93 (E.D. Mo. 2021).  But Plaintiff does not allege that she was jointly employed by the three Defendants.  On the contrary, her Second Amended Complaint specifically states that Padda and CIPM's scheme to claim that Plaintiff was an employee of either CDM or Lab Test was "factitious."  Doc. [52] ¶¶ 20-22.  She unambiguously contends that "Padda and [CIPM] were in fact . . . the employer of Plaintiff" during the relevant periods at issue in this lawsuit.  *Id.* ¶ 22.  Thus, even construing the pleading liberally and drawing all reasonable inferences in favor of Plaintiff, the Court cannot find that Plaintiff pleads that she was employed by Lab Test or CDM.  Therefore, their Motions to Dismiss are granted.[10]

### III. Plaintiff successfully pleads an assault and battery claim against Padda.

Padda moves to dismiss Plaintiff's only remaining claim against him individually: assault and battery.  Assault has two elements:  (1) that the defendant acted with intent to cause the plaintiff bodily harm or offensive contact, or apprehension of either; and (2) that the defendant caused plaintiff to be in apprehension of bodily harm or offensive contact.  Mo. Approved Jury Instr. (Civil) 23.01 (8th ed); *Phelps v Bross*, 73 S.W.3d 651, 656 (Mo. Ct. App. 2002).  "Battery is defined as the intended, offensive bodily contact with another."  *Phelps*, 73

---

[9] In the interest of judicial economy, CDM joined Lab Test's response.  *See* Docs. [82], [83].  The Court therefore interprets Lab Test's reply brief as making the same arguments on behalf of both Lab Test and CDM.

[10] CDM also contests Plaintiff's argument that she was an employee and not an independent contractor.  Docs. [83] at 1; [77] at 6-8.  Because Plaintiff has failed to establish an employer relationship with either CDM or Lab Test, the Court need not address the merits of that argument.

S.W.3d at 656 (citing *Geiger v. Bowersox*, 974 S.W.2d 513, 516 (Mo. Ct. App. 1998)); Mo. Approved Jury Instr. (Civil) 23.02 (8th ed).

Padda states in conclusory fashion that Plaintiff fails to sufficiently allege both his intent to cause offensive contact and Plaintiff's apprehension of bodily harm or offensive contact. Docs. [24] at 12; [84] at 5. The Court does not agree. Plaintiff's Second Amended Complaint alleges that Padda's touching of her body was "willful, wanton and malicious," which implies that it was intentional. *Id.* ¶ 59. And as to "apprehension of bodily harm or offensive contact," Plaintiff's allegations that she did not want to be touched by Padda and that she was offended by it are sufficient. *Id.* ¶ 58; *see Phelps*, 73 S.W.3d at 656. Thus, Plaintiff successfully states a claim for assault and battery against Padda.

## Conclusion

Plaintiff fails to state a Title VII claim against Defendants Lab Test and CDM, but her MHRA and Title VII claims against Defendant CIPM do "state a claim to relief that is plausible on its face," as does her assault and battery claim against Defendant Padda. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Accordingly,

**IT IS HEREBY ORDERED** that Defendants Interventional Center and Pain Management, PC, and Gupreet Padda's Motion to Dismiss (Doc. [23]) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Lab Test, LLC's Motion to Dismiss (Doc. [57]) and Defendant Cyber Diagnostic Medicine, LLC's Motion to Dismiss (Doc. [61]) are **GRANTED.**

A separate judgment shall accompany this Memorandum and Order.

Dated this 28th day of March, 2022.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE